# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| CYNTHIA CALAHAN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>THE PAIN MANAGEMENT GROUP, )<br>P.C. and DECENNIAL MANAGEMENT, )<br>LLC, )<br>)<br>Defendants ) | Case No. 3:16-cv-0847<br>Judge Aleta A. Trauger |

## MEMORANDUM

Plaintiff Cynthia Calahan filed this action in May 2016, asserting claims under the Family and Medical Leave Act ("FMLA") and the Americans With Disabilities Act Amendments Act of 2008 ("ADAAA"). Generally, the plaintiff alleges that the defendants, The Pain Management Group, P.C. ("PMG") and Decennial Management, LLC ("Decennial"), violated her rights under both statutory schemes when they terminated her employment while she was on FMLA leave.

Now before the court is the defendants' Motion for Summary Judgment. (Doc. No. 28.) The motion has been fully briefed and is ripe for review. For the reasons set forth herein, the motion will be granted in part and denied in part. Specifically, PMG is entitled to summary judgment, as the plaintiff recognizes, but material factual disputes preclude summary judgment for defendant Decennial Management.

## I. MATERIAL FACTS

PGM is a physician practice that operates six clinics and an ambulatory surgical center in

Middle Tennessee.[1] Decennial purchased PMG's physician practice and the related ambulatory surgery center in November 2014. Shortly thereafter, in February 2015, Decennial took over PMG's administrative functions and employed all non-clinical staff then working at PMG. (April 4, 2017 Dep. of R. Brown ("Brown Dep.") at 9–10, Doc. No. 29-14.) Cynthia Calahan, who had formerly been employed by PMG, became employed by Decennial beginning in February 2015.

Calahan was employed as a custodian, and her work for PMG and Decennial primarily involved cleaning both the practice's primary clinic, located in Antioch, and the ambulatory surgery center, which was located across the parking lot from the Antioch clinic. Calahan's regular tasks included laundry, cleaning the employee breakroom, cleaning bathrooms, sweeping, mopping, taking out the trash, cleaning medical machines, stripping and waxing the surgery center floors, wiping down exam beds, and ordering cleaning supplies. The plaintiff testified that some of these duties were to be performed on a daily basis, some on a weekly basis, and others—like stripping and waxing the surgery center floors—as infrequently as once every three to six months. (April 10, 2017 Dep. of C. Calahan Dep. ("Pl. Dep.") at 22, Doc. No. 29-1.)

According to Ryan Brown, General Counsel for Decennial, Decennial became aware shortly after taking over the management of the PMG clinics and surgery center that PMG's main clinic in Antioch and the surgery center were not being cleaned adequately and that their cleanliness was not at the necessary standard in light of the services offered. (Brown Dep. 14–16.) The record is unclear regarding whether Brown had personal knowledge about the cleanliness of the clinic. Jason Haley, COO, also testified that it was apparent to him as soon as Decennial took over from PMG that "things were not as clean as they should be and [we were]

---

[1] Unless otherwise indicated, the facts set forth herein are drawn from the plaintiff's Response to Defendants' Statement of Undisputed Material Facts (Doc. No. 35) and are undisputed for purposes of the Motion for Summary Judgment.

receiving complaints." (April 5, 2017 Dep. of J. Haley ("Haley Dep.") at 18, Doc. No. 29-21.)

Lee Ann Hess, the front end manager, became Calahan's direct supervisor sometime after Decennial acquired PMG. (May 8, 2017 Dep. of L. Hess ("Hess Dep.") at 13, Doc. No. 34-1.) Haley and Hess both testified that they spoke to the plaintiff several times about patient and other complaints, in particular about trash cans not being emptied and bathrooms not being cleaned. (Haley Dep. 14–15; Hess Dep. 14, 82–83.) In response, the plaintiff points out she was never written up and that no formal documented disciplinary action was ever taken against her. (Brown Dep. 16–17; Haley Dep. 15–16.) Hess testified that the plaintiff's performance improved after she and Haley communicated to the plaintiff more specific expectations regarding her duties and time management. (Hess Dep. 88.) Raif Erim, Decennial's President at the time, testified that he expected there to be a write-up on Calahan's performance in her personnel file but admitted he had not seen one. (April 10, 2017 Dep. of R. Erim ("Erim Dep.") at 34, Doc. No. 29-25.) He and Hess both testified that Decennial employed a sort of informal "three-strikes" policy of first issuing a verbal reprimand and then, if the problem was not corrected, following up with at least one written reprimand. (Erim Dep. 13–14; Hess Dep. 53–54.) It is evident from their testimony and that of others that, at least during the relevant time frame, Decennial had no clearly articulated disciplinary policy. (Brown Dep. 17–18; Haley Dep. 14–15.)[2]

It is undisputed that the plaintiff began to have knee problems as early as the summer of 2014. She began taking Supartz injections in her knees to help reduce the pain in March and

---

[2] In their Reply (Doc. No. 36), the defendants rely on Decennial's progressive discipline policy as set out in the Employee Handbook (Doc. No. 36-1), attached to the Reply. The defendants claim that this policy went into effect as part of the transaction in which Decennial took over the management and operations of PMG's clinics. (Doc. No. 36, at 4–5.) However, Ryan Brown testified that he did not know when the Handbook was implemented. (Brown Dep. 60–61.) Moreover, the defendants did not incorporate any statement concerning the Handbook in their Statement of Undisputed Material Facts, and Erim, Hess, and even Brown himself all testified that they were unaware of the existence of any formal disciplinary policy.

April 2015. When these proved ineffective, it became apparent that she would need to undergo knee replacement surgery. (Pl. Dep. 40–41, 45.) She testified that she let Erim and Haley know at least a month before formally requesting leave that she would need time off. (*See* Pl. Dep. 45 ("I know I went to them at least a month before and told them I was looking at surgery but I didn't know when.").) Haley recalled that they knew "a couple of months" before Calahan took leave that she was seeing a doctor . . . and looking into having surgery in the near future." (Haley Dep. 21.)

Calahan officially notified Erim that she needed to take FMLA leave on June 4 or 5, 2015, and she submitted the paperwork to him requesting FMLA leave on June 11. (Compl. ¶ 7; Pl. Dep. 52.) She requested leave from June 16, 2015 through September 16, 2015. (*Id.*; *see* Doc. No. 29-11.)

According to Decennial, it had begun looking at options for outsourcing cleaning and janitorial services during the first quarter of 2015, in particular because the company wanted to obtain a higher level of accreditation for the surgery center, which required adherence to a higher standard of cleanliness. (Brown Dep. 21; Haley Dep. 22, 26; Erim Dep. 27.) Erim testified that "the process was sort of already underway" when the company received notice from the plaintiff that she planned to take leave. (Erim Dep. 27.) Upon receiving that notice, according to Erim, Decennial's management concluded that they "needed to bring somebody in to start that process sooner rather than later." (*Id.*) He claims that, at the time the plaintiff went on leave, the company "had not come to any conclusion as to whether we might still be able to utilize her or not in that role [janitorial] or any other role . . . going forward." (*Id.* at 27–28.) Haley likewise testified that, although they started looking into other options earlier, he thought the decision to move forward with outsourcing was "maybe" made in the summer of 2015, "[k]nowing after she

told us the time frame of when she would be out, we needed to plan accordingly." (Haley Dep. 22.) Prior to receiving notice of when the plaintiff would be on leave, they were "still in the planning phases. . . . So, a certain date had not been set yet, but it would have been in the near future." (*Id.* at 24.)

Jason Haley, Decennial's COO, testified that he contacted two or three cleaning companies to obtain quotes for services, but he believes these companies may have provided verbal quotes. (Haley Dep. 24, Doc. No. 29-21.) He did not indicate when he contacted these companies and could not recall the names of any cleaning services other than Jani-King of Nashville ("Jani-King"). (Haley Dep. 26.) Jani-King submitted a formal written proposal for services to Decennial dated May 21, 2015. (Brown Dep. Ex. 6, Doc. No. 29-20, at 1.) Thus, it appears to be undisputed that Decennial contacted Jani-King sometime after Calahan had advised Decennial of her need to use FMLA leave.

Decennial made the decision to accept Jani-King's proposal by late May or early June 2015, and it executed a contract with Jani-King on June 5, 2015. (*See* Doc. No. 29-10.) The contract had an effective date of June 8, 2015 and a two-year term. (*Id.* ¶¶ 1.1, 1.2.) Calahan knew before going on leave that Decennial had employed a cleaning service to perform her functions while she was on leave; she, in fact, met with the Jani-King employee who would be taking over her functions to "tell her what all [she] did." (Pl. Dep. 64.) She was not told before taking leave that the cleaning service had been employed permanently or that her job was being "outsourced." (Haley Dep. 24–25.)

On August 13, 2015, the plaintiff contacted Haley to notify him that her doctor had authorized her to return to work on August 17, 2015, a month earlier than anticipated, the only limitation being that she should avoid stripping and waxing floors until being re-evaluated at her

next post-operative visit on September 11, 2015. (Doc. No. 29-3, at 5.) Haley responded on August 14, 2015 via text, stating: "Cynthia, this is Jason. Raif and I are still discussing potential roles etc at the company. We will contact you next week after we're able to sit down." (Pl. Dep. Ex. 2, Doc. No. 29-3, at 12.) He added, "You don't have to plan to come in until we contact you. Thank you." (*Id.* at 13.) The plaintiff replied that she did not understand why she could not "come back to cleaning." (*Id.*)

Haley did not respond, but the plaintiff met with Haley and Hess on August 18, 2015. At that meeting, Haley advised Calahan that Decennial had decided to outsource janitorial and cleaning services and that he did not know "for sure if they had anything available or when they would have anything available." (Pl. Dep. 59.) The plaintiff asked if she was fired; he responded, "I didn't say that. This is what I'm telling you." (*Id.*) Decennial, however, submitted a Separation Notice to the Tennessee Department of Labor, stating that the plaintiff's employment was terminated effective August 18, 2015, because the company "contracted with an outside cleaning and janitorial service. Janitor position is no longer available." (Doc. No. 29-12.)

Erim testified that the company had been considering having Calahan work alongside the outside janitorial company until she went on leave. (Erim Dep. 28–29.) Brown testified that the company was looking for other positions Calahan could perform beyond cleaning. (Brown Dep. 27.) Hess, as front end manager, testified that no one ever discussed with her the plan for the plaintiff after she returned from FMLA leave or about the possibility of her filling a different position. (Hess Dep. 32–33.) Hess assumed that Calahan would return to work after leave, and no one ever told her otherwise. (*Id.* at 33.) Hess also conceded that, although she did not know the plaintiff's work history and qualifications, "it would have been hard to have trained her for a front desk position," and she did not believe that she would have felt comfortable putting

Calahan in that position. (Hess Dep. 35–36.) She also testified that no degree was required for that position and that there were always front desk positions open. (*Id.* at 37, 38.)

Richard Henry, another janitorial employee, was not terminated immediately after the contract with Jani-King was signed but was permitted to keep performing cleaning duties as he had in the past. (Haley Dep. 50–51.) However, Henry did janitorial services at the other PMG clinics and only helped out with certain tasks at the Antioch clinic. (*Id.* at 51; Pl. Dep. 18–19 ("I think the only thing he did [at Antioch clinic] was vacuuming and shampooing the carpets."); Hess Dep. 17 ("Richard cleaned the satellite offices, and then Richard would come in to Antioch, and he would work in Antioch a couple of hours to kind of help [Calahan], so she didn't have to do everything.").) Henry's employment was eventually terminated when the company decided to extend the cleaning contract with Jani-King to cover the other PMG clinics. (Haley Dep. 50–51.)

The plaintiff filed this lawsuit on May 4, 2016, asserting FMLA and ADAAA claims against both PMG and Decennial.

## III. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim, the moving defendant must show that there is no genuine issue of material fact as to at least one essential element of that claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving

party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## IV. ANALYSIS

As indicated above, the plaintiff brings claims under the ADAAA and FMLA against both PMG and Decennial. (Compl., Doc. No. 1.) In her Response to the defendants' Motion for Summary Judgment, however, the plaintiff concedes that it has become clear to her, after having conducting discovery, that PMG was no longer her employer by the time the events at issue in the Complaint took place and that the claims against PMG should be dismissed. (Doc. No. 32, at 1 n.1.) PMG's Motion for Summary Judgment will therefore be granted.

Further analysis is required with respect to the claims against Decennial.

### A. FMLA Claims

The FMLA entitles eligible employees to take up to twelve weeks of leave during any twelve month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Employees who return to work within the twelve-week statutory period are entitled to return to their previous position or an equivalent position. *Id.* § 2614(a)(1). An employer violates the FMLA

when it "interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise" FMLA rights. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014) (citing 29 U.S.C. § 2615(a)(1); *Bryson v. Regis Corp.*, 498 F.3d 561, 569–70 (6th Cir. 2007)). The FMLA also prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" under the FMLA. 29 U.S.C. § 2615(a)(2).

The Sixth Circuit recognizes two distinct theories for recovery under the FMLA: "(1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555–56 (6th Cir. 2006) (quoting *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). Regarding these claims, the Sixth Circuit has stated:

> Although . . . a claim for retaliatory discharge is cognizable under either theory, the requisite proofs differ. The interference theory has its roots in the FMLA's creation of substantive rights, and if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred, regardless of the intent of the employer. The central issue raised by the retaliation theory, on the other hand, is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.

*Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012) (internal citations and quotation marks omitted). The plaintiff asserts a claim under both theories, arguing that, by terminating her instead of reinstating her after her leave, Decennial interfered with her entitlement to FMLA benefits and retaliated against her for exercising her right to take and use FMLA leave.

An employee may prove FMLA interference or retaliation using the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Demyanovich*, 747 F.3d at 427; *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). "[T]he

employee has the initial burden of establishing his *prima facie* case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual." *Demyanovich*, 747 F.3d at 427.

To establish a *prima facie* case of FMLA interference under § 2615(a)(1), the plaintiff must demonstrate that (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the plaintiff was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled. *Killian*, 454 F.3d at 556 (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).

To establish a *prima facie* case of FMLA discrimination/retaliation under § 2615(a)(2), the plaintiff must show that (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Id.* at 556 (quoting *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)).

For purposes of the defendants' Motion for Summary Judgment, Decennial does not dispute that the plaintiff can establish a *prima facie* case of FMLA retaliation and interference. (Doc. No. 31, at 12.) It argues instead that it has proffered legitimate, nondiscriminatory reasons for its actions and that the plaintiff cannot show that its reasons are pretextual.

Decennial asserts that, by the time the plaintiff took leave, it had already made the decision to hire Jani-King because it needed to meet more stringent standards of cleanliness than

the plaintiff could satisfy in order to achieve a higher level of accreditation for the surgery center. It posits that the decision to terminate the plaintiff was based solely on its previous election to outsource cleaning services to Jani-King, making the plaintiff's custodian position no longer available. The defendant also contends that the plaintiff was terminated as part of a reduction in force, which places upon the plaintiff an even greater burden of showing that her termination was discriminatory. (Doc. No. 31, at 13 (citing *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).

> According to the Sixth Circuit,
>
> [a] work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. . . . A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Barnes*, 896 F.3d at 1465. Although many reductions in force involve economic necessity, "business considerations," rather than economic necessity, is the criterion incorporated in the Sixth Circuit's definition. *Accord Payne v. Goodman Mfg. Co.*, 726 F. Supp. 2d 891, 901 (E.D. Tenn. 2010). Generally, when a reduction in force is involved, the plaintiff must meet a heightened *prima facie* burden. *Geiger v. Tower Automotive*, 579 F.3d 614, 623 (6th Cir. 2009). In addition to the other elements listed above, she must present some other "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes*, 896 F.2d at 1465.

As an initial matter, the court finds that the decision to replace the plaintiff with an outside cleaning company does not constitute a true reduction in force, as the plaintiff's duties were not absorbed by the company or spread among other already-existing employees. Instead, Decennial replaced the plaintiff by hiring an outside source to perform the plaintiff's duties—the

position did not stay open, and the plaintiff's tasks were not absorbed by other employees. Moreover, even if the decision to outsource did constitute a reduction in force, the Sixth Circuit does not appear to have applied *Barnes'* enhanced requirements for a *prima facie* case in the context of FMLA claims. Instead, the Sixth Circuit considers the decision to outsource as the defendant's legitimate, non-discriminatory reason for terminating the plaintiff. *See, e.g.*, *Cutcher v. Kmart Corp.*, 364 F. App'x 183, 191 (6th Cir. 2010) (articulating standard *prima facie* elements but finding that the defendant had met its burden of production of a legitimate nondiscriminatory reason for terminating the plaintiff when she returned from FMLA leave by demonstrating evidence of a reduction in force); *Smith v. City of Niles*, 505 F. App'x 482, 487 (6th Cir. 2012) (same); *Bell v. Prefix, Inc.*, 321 F. App'x 423, 426 (6th Cir. 2009) (same). This court therefore finds that, under the circumstances presented here, it is appropriate to consider the plaintiff's reduction-in-force argument as its proffered legitimate reason for terminating the plaintiff's employment but not as a basis for a more stringent *prima facie* threshold.

To demonstrate that the defendant's proffered reason is pretextual, a plaintiff may show that it "(1) has no basis *in fact*, (2) did not *actually* motivate the defendant's challenged conduct, or (3) was *insufficient* to warrant the challenged conduct." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (citation omitted), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also Johnson v. Fifth Third Bank*, No. 16-1111, 2017 WL 1244879 (6th Cir. April 5, 2017); *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003). The Sixth Circuit has explained:

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are "factually false." The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the

> plaintiff. . . .
>
> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Manzer*, 29 F.3d at 1084 (internal quotations and citations omitted).

The plaintiff does not dispute that Decennial actually employed an outside company to perform her job functions; she argues, instead, that the decision to outsource was itself based on her taking FMLA leave. As she points out, the acutely close temporal proximity between her announcing the need to take leave and Decennial's decision to hire Jani-King, coupled with other evidence, may indicate improper motive. (Doc. No. 33, at 9.) *See Seeger*, 681 F.3d at 283 ("[T]emporal proximity cannot be the sole basis for finding pretext. However, suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." (internal quotation marks and citations omitted)).

The court agrees that the timing of events, coupled with Decennial's witnesses' vagueness about that timeline and equivocation as to their intentions, gives rise to a permissible inference that the plaintiff was terminated in retaliation for her exercise of FMLA leave. Although Haley and Erim both testified that they started talking about contracting with an outside source for cleaning services during the first quarter of 2015, they offer no concrete evidence of having done so. And, although they purport to have talked to several cleaning services companies, the only one from which they obtained a written proposal was Jani-King, and they could not name any other company with which they were in discussions. Jani-King's

proposal was submitted to Decennial on May 21, 2015, a few weeks after the plaintiff first spoke to Erim about having to take leave sometime soon for knee surgery.

The two-year contract with Jani-King was finalized on June 5, 2015, the same day the plaintiff formally gave notice that she would need to take leave around June 15 for surgery and that she would be out for up to twelve weeks. She submitted the paperwork on June 11, 2015. Haley and Erim testified that, although they had talked about the need to hire an outside service, they did not actually pull the trigger on the decision until the plaintiff announced that she needed to take leave. Although the contract with Jani-King had a two-year term, the plaintiff was led to believe that the cleaning service was only coming in to replace her while she was on leave. Although Haley and Erim testified generally that they had not made the decision to terminate the plaintiff's employment until she gave notice that she was ready to come back to work and that they had given thought to keeping her in some other capacity, the record suggests that they never seriously contemplated putting her in a different position—for instance, by asking Hess whether there were other positions available—and that they did not perceive her as suitable for any other type of work. The plaintiff, however, was not told that the contract with Jani-King was permanent and that there was no job available for her to fill until she notified Haley and Erim in mid-August that she was ready to come back to work.³

---

³ An email exchange among Jason Haley, Raif Erim, and Ryan Brown that took place just after the plaintiff notified Haley that she was ready to return to work suggests that the company never gave serious thought to trying to place her in another position. On Thursday, August 13, 2015, Haley emailed Brown, telling him Calahan had contacted him and asking if it was "okay to say that we have hired a cleaning crew in her absence and that her services are no longer needed." (Doc. No. 29-18, at 2.) Brown responded affirmatively that he needed to tell her that her position had been eliminated. He added, "I assume there are no other viable positions for her to fill." (*Id.*) Haley replied: "Correct, there is not just [sic] another position she can do." (*Id.* at 1.) This appears to be the extent of the company's conversation about placing her elsewhere.

A reasonable jury could conclude that Decennial did not actually make the decision to outsource her job until after the plaintiff requested leave and that, but for the plaintiff's decision to take FMLA leave, it would not have made the decision to replace her with a cleaning service. The fact that Richard Henry, who also performed cleaning services, was not let go at the same time supports that conclusion. Likewise, a jury could conclude that Decennial interfered with the plaintiff's right to reinstatement when it declined to allow her to return to work after her FMLA leave. *See Demyanovich*, 747 F.3d at 429 ("If an employer takes an adverse employment action at least in part because an employee requested or took FMLA leave, the employer has denied an FMLA benefit." (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012)).

To the extent that Decennial claims that the plaintiff's poor performance also provided a legitimate, non-discriminatory reason for letting her go, the evidence, again, is equivocal and subject to interpretation. The defendant's claim of patient and physician complaints is undocumented. Although Hess and Haley claim they counseled the plaintiff about time management and her performance and provided her a written check list, they concede that there is no formal, written disciplinary action in the plaintiff's file and that a write-up is typically the next step after an employee fails to improve after verbal counseling. Further, Hess testified that the plaintiff's performance improved after she had been counseled.

As the defendant argues, the law is clear that the FMLA should not be "construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). Likewise, the right to non-interference with medical leave also is not absolute. "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her

FMLA request than he or she did before submitting that request." *Arban*, 345 F.3d at 401 (citation omitted).

In other words, the fact that the plaintiff took FMLA leave would not insulate her from termination as a result of her employer's dissatisfaction with her performance or the employer's decision, for business reasons, to outsource her job to a cleaning service company. Here, however, the intertwined sequence of events and the employer's witnesses' admission that Calahan's notice of her intention to take leave precipitated the decision to replace her with a cleaning service would permit a reasonable jury to conclude that the employer's decision was causally related to the plaintiff's exercise of her right to take leave. *Accord Arban*, 345 F.3d at 401–02 (upholding jury award in favor of the plaintiff, finding that close timing between taking FMLA leave and being fired combined with management's equivocal behavior was sufficient evidence of pretext). Based on the evidence presented, a jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against the plaintiff and/or interfered with her rights under the FMLA.

Accordingly, Decennial's Motion for Summary Judgment on the plaintiff's claims under §§ 2615(a)(1) and (2) will be denied.

### B. ADAAA Claim

The ADAAA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADAAA, a plaintiff may establish a *prima facie* case of disability discrimination by showing that: (1) she is an individual with a disability; (2) she is otherwise qualified to perform the essential functions of

the job she held or desired, with or without reasonable accommodation; and (3) she suffered an adverse employment action because of a disability. *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 8 (6th Cir. 2012) (citation omitted).

If the plaintiff establishes a *prima facie* case under the *McDonnell Douglas* framework, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision. If the defendant articulates such a reason, the burdens shifts back to the plaintiff to show a genuine issue of material fact as to whether the defendant's reason is pretextual. *See Moates v. Hamilton Cnty.*, 976 F. Supp. 2d 984, 991 (E.D. Tenn. 2013) (citing *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 (6th Cir. 2008)).[4]

Citing pre-Amendment case law, the defendant argues that the plaintiff cannot establish a *prima facie* case of discrimination because she cannot show that her position remained open while the employer sought other applicants or that the employee was replaced. (Doc. No. 31, at 15 (citing *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)).) Even assuming that this factor is an element of the plaintiff's *prima facie* case of disability discrimination under these circumstances, the fact that the plaintiff was replaced by a cleaning service gives rise, at the very least, to a question of fact as to whether she was "replaced" for purposes of the *prima facie* case. The defendant does not contest any other element of the plaintiff's *prima facie* case and the court finds, for purposes of the Motion for Summary Judgment, that the plaintiff has established a *prima facie* case of discrimination.

Otherwise, Decennial simply reiterates its argument that the plaintiff cannot establish that its proffered legitimate, non-discriminatory reasons for its action are pretextual. The court has

---

[4] There is, as yet, very little guidance from the Sixth Circuit interpreting the ADAAA, which took effect on January 1, 2009 and does not apply retroactively. *Donald*, 667 F.3d at 764.

already determined that there is a question of fact as to whether the proffered reasons are the true reasons. Thus, summary judgment on this claim, too, must be denied.

## V. CONCLUSION

For the reasons set forth herein, the court will dismiss the claims against defendant PMG but deny summary judgment to defendant Decennial. An appropriate order is filed herewith.

It is so ORDERED.

This 31st day of July 2017.

_____
ALETA A. TRAUGER
United States District Judge